# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Hon. Douglas E. Arpert |
| v. | Mag. No. 13-2550 (DEA) |
| MENDEL EPSTEIN, <br> MARTIN WOLMARK, <br> ARIEL POTASH, <br> JAY GOLDSTEIN a/k/a "Yaakov", <br> MOSHE GOLDSTEIN, <br> BINYAMIN STIMLER, <br> DAVID HELLMAN, <br> SIMCHA BULMASH, <br> AVROHOM GOLDSTEIN, and <br> SHOLOM SHUCHAT | **SUPERSEDING** <br> **CRIMINAL COMPLAINT** |

I, Bruce D. Kamerman, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Bruce D. Kamerman, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

October 10, 2013                    at      Trenton, New Jersey
Date                                         City and State

Honorable Douglas E. Arpert
United States Magistrate Judge                  _____
Name and Title of Judicial Officer              Signature of Judicial Officer

# ATTACHMENT A

From on or about August 7, 2013, to on or about October 9, 2013, in Ocean and Middlesex Counties, in the District of New Jersey, and elsewhere, Defendants

MENDEL EPSTEIN,
MARTIN WOLMARK,
ARIEL POTASH,
JAY GOLDSTEIN a/k/a "Yaakov",
MOSHE GOLDSTEIN,
BINYAMIN STIMLER,
DAVID HELLMAN,
SIMCHA BULMASH,
AVROHOM GOLDSTEIN, and
SHOLOM SHUCHAT

conspired and agreed, together and with others known and unknown, to knowingly and unlawfully seize, confine, inveigle, decoy, kidnap, abduct, and hold a person for ransom, reward and otherwise, that is, to threaten and coerce him to consent to a Jewish divorce, and traveled in interstate commerce and used means, facilities and instrumentalities of interstate and foreign commerce in furtherance of the commission of the offense.

In furtherance of the conspiracy, and to accomplish its object, Defendants committed the following overt acts, among others:

1. On or about August 7, 2013, Defendants MARTIN WOLMARK and MENDEL EPSTEIN participated in a telephone conference call, the purpose of which was to discuss the possibility of authorizing the use of violence to obtain a forced divorce.

2. On or about August 14, 2013, Defendant MENDEL EPSTEIN met with undercover FBI agents in Ocean County, New Jersey and discussed kidnapping the purported husband of an undercover FBI agent.

3. On or about September 29, 2013, Defendants MENDEL EPSTEIN and JAY GOLDSTEIN drove to a location in Middlesex County, New Jersey to determine whether it was a suitable location for the kidnapping.

4. On or about October 2, 2013, Defendants MENDEL EPSTEIN, MARTIN WOLMARK, JAY GOLDSTEIN and ARIEL POTASH met in Rockland County, New York to authorize the use of violence to obtain a forced divorce.

5. On or about October 8, 2013, Defendant MENDEL EPSTEIN met with an undercover FBI agent in Kings County, New York and discussed logistics for the planned kidnapping.

6. On or about October 9, 2013, Defendants JAY GOLDSTEIN, ARIEL POTASH, MOSHE GOLDSTEIN, BINYAMIN STIMLER, DAVID HELLMAN, SIMCHA BULMASH, AVROHOM GOLDSTEIN, and SHOLOM SHUCHAT traveled to the same location in Middlesex County, New Jersey referred to above in paragraph 3, to execute the planned kidnapping and forced divorce.

All in violation of Title 18, United States Code, Section 1201(c).

## ATTACHMENT B

I, Bruce D. Kamerman, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have knowledge of the facts set forth below as a result of my participation in this investigation as well as from my review of reports from, and discussions with, other law enforcement personnel. Where statements of others are related herein, they are related in substance and part. Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### Background of the Investigation

1. According to Jewish law, in order to effect a divorce, a husband must provide his wife with a document known as a "*get*." Although a divorce may only be initiated by the husband issuing a *get*, the wife has the right to sue for divorce in a rabbinical court, known as a "*beth din*", which may order the husband to issue the *get*. If the husband refuses the court's demand, he may be subjected to various penalties in order to pressure him into consenting to the divorce, i.e., giving the *get*. A woman whose husband will not consent to a divorce is known as an "*agunah*" ("*agunot*" in plural).

2. Defendants MENDEL EPSTEIN and MARTIN WOLMARK are Jewish Rabbis who charge *agunot* and their families thousands of dollars to obtain *gets* from recalcitrant husbands by means of violence.

3. Defendants ARIEL POTASH and JAY GOLDSTEIN a/k/a "Yaakov" are Orthodox Jewish men who assist Defendants MENDEL EPSTEIN and MARTIN WOLMARK in obtaining *gets* from recalcitrant husbands by means of violence.

1

4. Defendants MOSHE GOLDSTEIN, BINYAMIN STIMLER, DAVID HELLMAN, SIMCHA BULMASH, AVROHOM GOLDSTEIN, and SHOLOM SHUCHAT are "tough guys" and/or witnesses who participate in the actual kidnapping and assault of the recalcitrant husbands to coerce them into giving the *get*.

5. Essentially the Defendants' organization operated as follows. The family of an *agunah* made contact with the Defendants. The *agunah's* family then made payment to the Defendants, after which the Defendants convened a *beth din*, which issued a contempt order, known as a "*seruv*," against the husband. If the husband failed to respond, the *beth din* issued a ruling, known as a "*psak din*," authorizing the use of coercion and/or violence to obtain the *get*. The Defendants then arranged to kidnap the recalcitrant husband and assault him until he consented to the divorce, i.e., until he "gave the *get*."

6. In a recorded conversation on August 14, 2013, Defendant MENDEL EPSTEIN admitted to planning, approving and committing numerous kidnappings and coerced *gets*. Specifically, Defendant EPSTEIN claimed that his organization kidnaped one recalcitrant husband approximately every year or year and a half.

**The Undercover Operation**

7. An undercover FBI Special Agent ("UCE-1") posed as an Orthodox Jewish wife whose husband was unwilling to consent to a divorce. A second undercover FBI Special Agent ("UCE-2") posed as the brother of UCE-1, who was willing to pay for a kidnapping in order to coerce UCE-1's recalcitrant husband into consenting to a divorce. (Hereinafter, UCE-1's purported husband will be referred to as "the Husband").

8. On August 7, 2013, UCE-1 and UCE-2 (collectively, "the UCEs") made a

2

telephone call to Defendant MARTIN WOLMARK. During the call, which was recorded by the UCEs, the UCEs presented their case that they were desperate for a religious divorce and were willing to pay a large sum of money to obtain the divorce. WOLMARK talked about the mechanism for coercing a divorce and stated that it would be costly.

9. Specifically, WOLMARK stated:

> Now, the question is, under certain conditions the person can be coerced to give the *get*. Now, there are a couple of ways to do that. To get that situation created that he can be coerced on the *get*, it's a, it's a, it's a process. It could happen but it's a (UI) process. Ya know, it means getting the paperwork done. You have to, we have to, convene a special *beth din* and see if there are grounds to, to, to coerce him on the *get*.
> That's step number one. Step number two is then going ahead and getting it done. Now, each process, if it's done, I mean, could be very costly, ya know. It doesn't have to, ya know. It depends. It's, it's, in other words, you need special Rabbis who are going to take this thing and see it through to the end. Um, that, that, that, that's probably the most effective way. Ya know, there's another way. Getting a guy like Mendel Epstein who's a, ya know like a hired hand or so. Who'll go and maybe make a, ya know. If he doesn't have him around here, he's not gonna be effective. In other words, you need to get him to New York where someone either can harass him or nail him. Plain and simple.

10. Defendant MARTIN WOLMARK then connected Defendant MENDEL EPSTEIN into the conference call. At the conclusion of that call, Defendant EPSTEIN told the UCEs to call him an hour later on his home telephone to discuss the details. Defendant EPSTEIN then told Defendant WOLMARK to stay on the line.

11. Approximately one hour later, UCE-1 and UCE-2 called Defendant MENDEL EPSTEIN as directed. During that call, they arranged to meet with Defendant EPSTEIN at his house in Ocean County, New Jersey, on August 14, 2013, because, in Defendant EPSTEIN's words: "I don't think this is a phone conversation, am I correct?"

12. On August 14, 2013, the UCEs met with Defendant MENDEL EPSTEIN at his residence in Ocean County, New Jersey. The meeting was consensually video and audio

3

recorded by the UCEs.

13. During the course of the meeting, Defendant MENDEL EPSTEIN spoke about kidnapping, beating and torturing husbands in order to force a divorce. Indeed, he specifically stated:

> Sup, suppose we, ya know this is an expensive thing to do. It's not simply; we're talking, uh, I don't want to use the, the (UI) terms but, basically what we are going to be doing is kidnapping a guy for a couple of hours and beating him up and torturing him and then getting him to give the *get*.

14. Defendant MENDEL EPSTEIN talked about forcing compliance through the use of "tough guys" who utilize electric cattle prods, karate, handcuffs and place plastic bags over the heads of the husbands, at one point telling UCE-2:

> Defendant EPSTEIN: Wait, wait, wait a minute. Wait a second here. I guarantee you that if you're in the van, you'd give a *get* to your wife. You probably love your wife, but you'd give a *get* when they finish with you. So, and it's, hopefully, there won't even be a mark on him.
> UCE-2: You can leave a mark. (Chuckle).
> Defendant EPSTEIN: No, no, no, no, we ...
> UCE-2: I know. I understand what you're saying.
> Defendant EPSTEIN: We prefer not to leave a mark ...Right. Because then when they do go to the police, the police look at the guy ...
> UCE-2: Yeah, what's wrong ...
> Defendant EPSTEIN: You look the same. You know, ah, what's so terrible. They did this to give a *get*. How long didn't you give a *get*. Ah, two years, yeah. I mean, I, I've traveled, I've been in South America too ...And basically the reaction of the police is, if the guy does not have a mark on him ... Then uh, is there some Jewish crazy affair here, they don't get involved.

\* \* \*

> Defendant EPSTEIN: We take an electric cattle prod.
> UCE-1: Electric cattle prod, okay.
> Defendant EPSTEIN: If it can get a bull that weighs five tons to move ... You put it in certain parts of his body and in one minute the guy will know.

15. Defendant MENDEL EPSTEIN admitted to committing approximately one

4

kidnapping every year to year and a half. "One a year. Year and a half. So that way the police jurisdictions... They're all linked together now and everything. It's not so simple, but, but uh ..."

16. Defendant MENDEL EPSTEIN stated that the kidnapping would cost $10,000 to pay for the rabbis on the rabbinical court to approve the kidnapping and an additional $50,000 to $60,000 to pay for the "tough guys" who would conduct the beating and obtain the forced *get*. Defendant EPSTEIN stated that Defendant MARTIN WOLMARK officiates during the kidnapping and forced *get* and that Defendant EPSTEIN's son is one of the "tough guys" who uses his karate skills on the victims to facilitate the divorces.

17. During the meeting the UCEs explained that the Husband lived in South America, and had a residence in Florida. The UCEs said that UCE-2 and the Husband were longstanding business partners, doing real estate deals together. UCE-2 said that he had introduced UCE-1 and the Husband. According to UCE-2, he and the Husband were still business partners, but once the marriage between UCE-1 and the Husband deteriorated (which UCE-1 claimed was largely because of financial issues and the fact that the Husband decided that he did not want children), the business relationship between UCE-2 and the Husband had deteriorated as well. According to UCE-2, the Husband claimed that UCE-2 owed him money from past business deals, and the Husband would not give UCE-1 a *get* unless UCE-2 paid the Husband. UCE-2 said he could lure the Husband from South America to a location in New Jersey under the pretext of a business deal.

18. In a series of subsequent telephone conversations, UCE-1 arranged with Defendant MENDEL EPSTEIN and Defendant MARTIN WOLMARK to have a *beth din* convene in Rockland County, New York on October 2, 2013. The purpose of this *beth din* was to issue a *psak din* authorizing the use of violence to obtain a forced *get*.

5

19. UCE-2 also had subsequent telephone conversations and e-mail exchanges with Defendant MENDEL EPSTEIN regarding where and how the proposed forced *get* was to take place. In these conversations, UCE-2 suggested that he could lure the Husband to New Jersey during the week of October 7, 2013.

20. Specifically, on September 25, 2013, UCE-2 called Defendant MENDEL EPSTEIN and proposed a warehouse in Middlesex County, New Jersey (the "Warehouse") could be used for obtaining the forced *get*. In response, Defendant EPSTEIN indicated that he wanted to have his people investigate the proposed site beforehand, to ensure its feasibility. Defendant EPSTEIN then said he needed money to have people investigate the Warehouse (which would, in his words, "commit them"). In response, UCE-2 told him that he would wire $20,000 to Defendant EPSTEIN after the *psak din* was issued on October 2, 2013.

21. In that call, Defendant MENDEL EPSTEIN and UCE-2 discussed whether it would be preferable to conduct the beating of UC-1 inside the Warehouse or in a van in the parking lot. Defendant EPSTEIN said they did not necessarily need to go inside because "they don't need him for long, believe me. They'll have him in the van, hooded, and it will happen."

22. In that call, Defendant MENDEL EPSTEIN and UCE-2 discussed getting the Husband to and from the Warehouse. UCE-2 said that he would drive the Husband there. MENDEL EPSTEIN then asked how the Husband was going to get home. MENDEL EPSTEIN told UCE-2 he preferred that UCE-2 bring the Husband home so there would be "no police involvement."

23. On September 29, 2012, FBI surveillance teams observed Defendant MENDEL EPSTEIN and Defendant JAY GOLDSTEIN drive to the Warehouse. Defendant EPSTEIN then

6

got out of the vehicle and appeared to take a picture of the Warehouse with his cell phone before driving away. Soon thereafter, Defendant EPSTEIN sent an e-mail to UCE-2 stating: "We were at the site on blue heron its excellent police station two blocks away ask if they patrol or of they have private security did not seem that way surveillance cameras?? Really out of the way great." (Lack of punctuation in original).

24. The next day, September 30, 2013, UCE-2 called Defendant MENDEL EPSTEIN, and confirmed that there would be no security patrols. Defendant EPSTEIN said the building was "better than good" and that his people would prefer to be inside the Warehouse when they obtained the forced *get*. UCE-2 and Defendant EPSTEIN then solidified their plan for the kidnapping and coerced *get*: UCE-2 would unlock the Warehouse in the evening on October 9, 2013, and allow the Targets inside. The Targets would then prepare inside the Warehouse, and UCE-2 would pick up the Husband. UCE-2 would then return to the Warehouse a short time later with the Husband.

25. Defendant MENDEL EPSTEIN then confirmed that UCE-2 was going to wire $20,000 after the *psak din* was issued on October 2, 2013. Defendant EPSTEIN then instructed UCE-2 to bring a check for $30,000 with him to the Warehouse on October 9, 2013, and give that check to the *sofer* (meaning the scribe), because his guys "need to be paid within twenty-four hours."

26. On October 2, 2013, UCE-1 traveled to Rockland County, New York for the *beth din*. There she met Defendants MENDEL EPSTEIN, MARTIN WOLMARK and JAY GOLDSTEIN. The meeting of the *beth din* was consensually video and audio recorded by UCE-1. UCE-1 was then escorted into a back office to begin the *beth din*. When UCE-1 asked Defendant JAY GOLDSTEIN who he was, Defendant JAY GOLDSTEIN refused to answer

7

UCE-1's questions about his identity, explaining that it was better "the less information you know about myself."

27. During the *beth din*, Defendant MARTIN WOLMARK asked UCE-1 to explain her situation. Specifically, he asked: "Why do you have to be released from this marriage, even if your husband has to be coerced?" UCE-1 explained her situation and why she is desperate for a divorce from her husband, who refuses to give her a get. Defendant EPSTEIN directed Defendant JAY GOLDSTEIN to write down everything for the *psak din*.

28. About one hour into the *beth din*, Defendant ARIEL POTASH arrived to serve as the "*shliach*," that is, the person appointed to serve as UCE-1's agent to accept the *get* from the husband, since UCE-1 will not be present for the forced *get*. When asked by UCE-1 about his role, Defendant POTASH explained that he does "whatever the rabbis tell him." Defendant POTASH further explained to UCE-1 that there is no need for UCE-1 to know who he is, saying: "I'll make it even more clear - if you see me, two months ... down the street, you don't know me, I don't know you." Two additional young males then arrived to witness the appointment of Defendant POTASH as the *shliach*. Defendant MARTIN WOLMARK instructed both witnesses to sign a document, omitting their last names, attesting to the appointment of the *shliach*.

29. At the end of the *beth din*, Defendant MARTIN WOLMARK asked UCE-1 about "the plan" for the forced *get*, and whether UCE-1 knew the location and the timing. Defendant MENDEL EPSTEIN confirmed the plan for the forced *get* was good, stating, "it's at night, and it's a weird place, it's very good ... hopefully the patrol will not be out on patrol that night." Defendant EPSTEIN also told UCE-1 that during the forced *get*, "you should be out in public" among a lot of people.

8

30.  After the *psak din* was issued on October 2, 2013, UCE-2 transmitted $20,000 to MENDEL EPSTEIN by wire transfer.

31.  On October 8, 2013, UCE-2 met with Defendant MENDEL EPSTEIN at his residence in Kings County, New York. The meeting was consensually audio recorded by UCE-2. During the course of the meeting, EPSTEIN and UCE-2 discussed EPSTEIN's prior kidnappings as well as the details for the planned October 9, 2013, kidnapping of the Husband. EPSTEIN told UCE-2 that eight people would be present for the kidnapping, to include four "tough guys," two witnesses, a *sofer*, and a person to accept the *get* on behalf of UCE-1. EPSTEIN stated that he would not be present for the kidnapping; rather, he would be in some public place, so that witnesses could confirm his alibi if he were later questioned by the police. EPSTEIN directed UCE-2 to bring a check for $30,000, made out to EPSTEIN, and to give the check to the *sofer* at the Warehouse.

32.  On October 9, 2013, Defendants ARIEL POTASH, JAY GOLDSTEIN, MOSHE GOLDSTEIN, BINYAMIN STIMLER, DAVID HELLMAN, SIMCHA BULMASH, AVROHOM GOLDSTEIN, and SHOLOM SHUCHAT (collectively, the "Kidnap Team") traveled to the Warehouse in Middlesex County, New Jersey to execute the planned kidnapping and forced *get*. At approximately 8:00 p.m., UCE-2 arrived at the Warehouse. Shortly thereafter, the Kidnap Team arrived at the Warehouse in two dark minivans. Upon exiting the minivans, some of the Kidnap Team members put on masks and entered the Warehouse office with UCE-2, while the remaining Kidnap Team members walked around the outside of the Warehouse with flashlights.

33.  Over the next fifteen minutes, members of the Kidnap Team went in and out of the

Warehouse office wearing ski masks, Halloween masks or bandanas. While inside the Warehouse office, the Kidnap Team members discussed their plan for assaulting the Husband. Specifically, they discussed how they planned to grab the Husband, pull him down, tie him up, and take his phone, as well as where they would grab him and drag him, making sure to keep him away from the windows.

34. At approximately 8:20 p.m., UCE-2 left the Warehouse, purportedly to get the Husband. Approximately three minutes later, law enforcement moved into the Warehouse office and arrested the eight members of the Kidnap Team. One member of the Kidnap Team was wearing a garbage bag over his clothes; another member was wearing a Metallica t-shirt over his clothes. Law enforcement searched the Warehouse office and seized, *inter alia*, the following items that the Kidnap Team had brought with them to use during the kidnapping and forced *get*: masks, rope, surgical blades, a screwdriver, plastic bags, and items used to ceremonially record the *get* (e.g., a board with string attached, feather quills and ink bottles).